**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Frank Briscoe Company, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 93-5222 (JAG) |
| | : | |
| The Travelers Indemnity Company | : | |
| and The Travelers Companies, | : | |
| | : | **OPINION** |
| | : | |
| Defendants, | : | |
| | : | |
| Gabriel R. Calafati, | : | |
| | : | |
| Additional Defendant | : | |
| on Counterclaim. | : | |
| | : | |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before the Court on a motion for partial summary judgment, pursuant to FED. R. CIV. P. 56(c), by Defendants The Travelers Indemnity Company and The Travelers Companies (collectively "Travelers" or "Defendants"). This is an on-going contractual dispute between Plaintiff, Frank Briscoe Company ("Briscoe" or "Plaintiff") and Travelers. The Court has issued several Opinions and Orders in this matter including, Frank Briscoe Co., Inc. v. Travelers Indem. Co., 899 F. Supp. 1304 (D.N.J. 1995) (hereinafter "Agency Opinion") and Frank Briscoe Co., Inc. v. Travelers Indem. Co., 65 F. Supp.2d 285 (hereinafter "Summary Judgment Opinion").

Defendants now move for partial summary judgment on Briscoe's Calculation Claims, seeking to identify and confirm the elements of the formulae to be used to calculate amounts and

estimates of amounts, if any, that would be payable to Frank Briscoe Company, Inc. ("Briscoe"),

pursuant to the Agreement for Disposition of Collateral entered into by the parties on August 2,

1982 ("ADC"). (Defs.' Memo. of Law in Supp. of Their Renewed Mot. for Partial Summ. J. on

Pl.'s Calculation Claims, at 1 (hereinafter "Defs.' Memo. Partial Summ. J.").) The Calculation

Formulae at issue in the instant motion include: 1) the formula for determining the Final

Contingent Fee ("Final Contingent Fee Formula") that would be payable to Briscoe at the end of

the Program and 2) the formula for determining whether Briscoe was eligible to receive advance

payments against its Final Contingent Fee or a credit for such an advance ("Estimation

Formula").

For the reasons set forth below, this Court grants Defendants' motion for partial

summary judgment on the Calculation Claims presented here.

## BACKGROUND

This matter involves a contract dispute between Briscoe and Travelers. Briscoe was a

renowned construction company. Among its many major projects were two of the Gateway

office buildings in Newark, New Jersey, and Giants Stadium and Meadowlands Race Track in

East Rutherford, New Jersey. Since the early 1970s, Travelers provided Briscoe with payment

and performance bonds for Briscoe's construction contracts. Due to severe financial troubles in

late 1979, Briscoe became unable to meet its obligations. At the time, Travelers estimated its

potential exposure at approximately $100 million if Briscoe should default on its various

construction projects. To avoid this possibility, Travelers chose to assist Briscoe through a

series of loans totaling approximately $24 million. In exchange for the loan, Travelers obtained

a security interest in all of Briscoe's assets. The parties memorialized their agreement in the

2

Loan and Security Agreement or "LSA."

The Loan and Security Agreement provided that Briscoe would make monthly interest payments on the loans. Briscoe eventually defaulted when it failed to make the scheduled monthly payments. At the time of default, Briscoe owed Travelers $22 million in loan principal and $6 million in accrued interest. Travelers, as a secured creditor, chose to take possession of all of Briscoe's assets (the collateral for the loans) and to liquidate them.

## AGENCY OPINION

After a two day trial, Judge Wolin wrote the Agency Opinion. In that Opinion, he considered a claim by Briscoe that it was entitled to accumulated interest on all of the funds deposited with Travelers, pursuant to the ADC. Briscoe, 899 F. Supp. at 1307. Briscoe asserted that it and Travelers were partners in the ADC and, therefore, Travelers was required to accrue interest for Briscoe on the Program proceeds. Id. By 1995, Briscoe had collected and deposited over $84 million with Travelers, and Briscoe claimed that it was entitled to $400 million in interest on those gross proceeds. Id.

In order to make a decision on Briscoe's claim, the Court first sought to determine whether the ADC was a clear, unambiguous, and enforceable contract. Id. at 1308. The Court examined (1) the contract itself, (2) the parties' pre-execution conduct and (3) the parties' post-execution conduct. Id. at 1309. The Court noted that the negotiation of the ADC took well over a year, and that both sides were represented by counsel during the negotiations. Id.

Construing the express language of the ADC, the Court concluded that "Travelers owns the money deposited under the ADC as a secured creditor . . . . Any interest earned on the money . . . is the sole and exclusive property of Travelers." Id. at 1316. This conclusion did not end the

3

Court's inquiry. Noting that the U.C.C. did not alter the Court's interpretation of the ADC, the Court next examined the parties' conduct. Id. at 1317. The Court found that the parties' pre-execution conduct evidenced that Travelers had rejected several attempts by Briscoe to include an interest component into the ADC. Id. at 1323. Further, the Court found that in late 1989, William F. Kelly distributed a Briscoe internal memorandum in which he proposed several ways to interpret the ADC that would allow Briscoe to increase its recovery. Id. That memorandum, coupled with Briscoe's silence with respect to interest until 1989, led the Court to conclude that Briscoe was making "an after-the-fact attempt . . . to earn more money under the ADC." Id. The Court found that "the post-execution conduct of the parties demonstrates that after the Program dragged on far longer than anyone anticipated, Briscoe began to search for ways to maximize its share." Id. at 1325.

The Court also analyzed the trial testimony of the parties. Id. at 1325-32. The Court found the testimony of Briscoe's two witnesses, Howard Loeffler, former Travelers employee, and Gabriel Calafati, Briscoe President, not credible. Id. at 1325-30. In contrast, the Court found the testimony of Travelers' witness, Mark Larner, the ADC's scrivener, "highly convincing." Id. at 1332. Larner testified, among other things, that the ADC follows the Uniform Commercial Code and was designed to articulate Travelers' rights after Briscoe's default under the Loan and Security Agreement. Id. at 1330. The Court held that Briscoe could not imply terms into the ADC based on the unsupported contention that the driving force behind the ADC was Travelers' fear of third-party claimants. Id. at 1332.

The Court held that Travelers, as the exclusive owner of all money deposited under the ADC, had no duty to accrue interest on Briscoe's behalf. Id. at 1334. The Court based its

4

holding on, among other things, the following factual and legal conclusions: (1) the ADC language and meaning was clear and unambiguous; (2) the ADC created an agency relationship whereby Briscoe was Travelers' agent; and (3) Travelers was the owner of all of the collateral under the ADC.  Id. at 1344.

## STANDARD

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994); Nat'l State Bank v. Fed. Reserve Bank of N.Y., 979 F.2d 1579, 1581 (3d Cir. 1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23). In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences – including on issues of credibility– in favor of the non-moving party. Watts v. Univ. of Del., 622 F.2d 47, 50 (3d Cir. 1980).

## LAW OF THE CASE

This Court has previously entered several Opinions and Orders in this matter. At the outset of this Opinion, this Court notes that the law of the case doctrine governs the disposition of the motions presented. The law of the case doctrine militates against re-deciding issues of law previously resolved in the same case, either expressly or by implication. Public Interest Research Group of N.J., Inc. v. Magnesium Elecktron, Inc., 123 F.3d 111, 116 (3d Cir. 1997). As the Third Circuit has indicated, there are "extraordinary circumstances" that warrant a court's reconsideration of an issue decided earlier in the course of litigation. Id. at 116-17. These circumstances include when "new evidence is available; . . . a supervening new law has been announced; or . . . the earlier decision was clearly erroneous and would create manifest injustice." Id. at 117. This Court finds that the law of the case in this instance includes (1) the Agency Opinion and the express and implied findings therein; (2) the denial of reconsideration of the Agency Opinion; (3) the Summary Judgment Opinion; (4) the denial of reconsideration of

6

the Summary Judgment Opinion; and (5) the Orders and Opinions of this Court subsequent to
these noted Opinions.

## ANALYSIS

Travelers now moves this Court to grant its motion for summary judgment on Briscoe's
remaining Calculation Claims involving the Final Contingent Fee Formula and the Estimation
Formula (collectively, "calculation formulae"). (Defs.' Memo. Partial Summ. J. at 1.)
Travelers' motion challenges three issues raised by Briscoe's Calculation Claims: 1) whether the
calculation formulae should include the two reserves, a fixed reserve of $2 million and a
discretionary reserve, provided for in Section 9.4 of the ADC; 2) whether the reference to non-
program loans among the set-offs in the calculation of the Estimation Fee includes both the
interest and the principal of the non-program loans; 3) whether the ADC opinion prioritizes the
debt to which Travelers must apply the proceeds of the liquidation.

Travelers argues that by taking the $3 million guaranteed minimum fee and over $12
million in requested loans, Briscoe received, during the course of the Program, any monies that
would have constituted Briscoe's fee at the end of the Program. (Defs.' Memo. Partial Summ. J.
at 3.)  In fact, Travelers argues that the money Briscoe received during the course of the Program
is "well in excess" of any fee that it may have received at the termination of the Program.
(Defs.' Memo. Partial Summ. J. at 3.)

The formulae for the Final Contingent Fee and the Estimation Fee are found in Section 9
of the ADC.  Relevant provisions of Section 9 of the ADC state:

> Section 9.1
>
> Upon collection and/or disposition of all of the Collateral (or such earlier
> date as Travelers shall have determined in its sole and absolute discretion

7

that substantially all of the Collateral shall have been collected and disposed of . . .), and provided Briscoe shall not be in default . . . Briscoe shall become entitled to and shall receive an amount equal to fifty (50%) percent of the net proceeds realized by Travelers from the collection . . . of the Collateral . . . .

\*       \*       \*       \*       \*

Section 9.4

After the expiration of eighteen (18) months from the Effective Date, provided [Briscoe] shall not then be in default as . . . ., and shall have completed performance of the contracts as provided in Paragraph 7, . . . Travelers agrees on that date to estimate the amount of the Net Proceeds Percentage Amount which [Briscoe] may become entitled to receive as provided in Paragraph 9.1 and quarterly thereafter to adjust said estimate. As to such estimated amount as adjusted from time to time, Travelers shall calculate interest at the rate of fifteen (15%) percent per annum, or in its sole and exclusive discretion, advance such estimated amount or any portion thereof to [Briscoe] against the Net Proceeds Percentage Amount which [Briscoe] may become entitled to receive as provided in Paragraph 9.1. [Briscoe] shall receive any interest which shall have been calculated only if and when [Briscoe] shall receive the Net Proceeds Percentage Amount which it may become entitled to receive as provided in paragraph 9.1.

(ADC ¶¶ 9.1; 9.4.)

As noted above, in particular Travelers seeks summary judgment on the elements of the

Estimation Fee Formula. (Defs.' Memo. Partial Summ. J. at 41-44.) To calculate the Estimation

Fee and the Final Contingent Fee, pursuant to Section 9.4, one must deduct from the Net

Proceeds Percentage Amount[1] "a reserve of $2 million" and "an additional reserve for any

advance or payment, whether or not paid or accrued, or any contingent liability." (ADC ¶

9.4(a).)

_____

[1] In its entirety the provision states: "[f]rom the net proceeds realized from the collection and/or disposition of the Collateral (as defined in paragraph 9.3) as of the date of the estimate, there shall be deducted therefrom the sum of (i) a reserve of $2 million; (ii) an additional reserve for any advance or payment, whether or not paid or accrued, or any contingent liability." (ADC ¶ 9.4(a)).

8

In addition, to calculate any fee that would be payable to Briscoe, one would apply the following provisions from Section 9.4.

> From 50% of the amount determined in accordance with subparagraph (a) above there shall be deducted the sum of the following and the resultant amount shall constitute the estimated amount as provided in this paragraph 9.4:
>
> (i)    the Minimum Guarantee whether or not received in full by [Briscoe];
> (ii)   any advances previously made by Travelers as provided in paragraph 9.4 against the Net Proceeds Percentage Amount which [Briscoe] may become entitled to receive as provided in Paragraph 9.1;
> (iii)  the aggregate amount of the additional loans as provided in paragraph 10.1 whether or not made;
> (iv)  the aggregate amount of any additional loans actually made as provided in paragraph 10.2.

(ADC ¶ 9.4(b).)

## I.    Fixed and Discretionary Reserves

Paragraph 9.4 discusses the deduction of a reserve of $2 million and an additional reserve for any contingent liability that might arise. (ADC at ¶ 9.4.) Briscoe proffers that there are genuine issues of material fact relating to the two reserves provided for in Paragraph 9.4 of the ADC. (Pl.'s Memo. of Law in Opp'n to Defs.' Renewed Mot. for Partial Summ. J. at 23-33, hereinafter "Pl.'s Memo. Opp'n".)

First, Briscoe argues that the reserves should not be deducted because Travelers breached its obligation under this provision of the ADC by failing to give Briscoe quarterly estimates of its fee, and, in the instances where "Travelers did not advance [the estimated fee]," failing to account for interest accruing on the fee. (Id. at 23-25.)

9

Second, Briscoe contends that there is a genuine issue of material fact regarding the need

for a discretionary reserve, the appropriate amount, if any, of the discretionary reserve, and even

if such a reserve were appropriate, whether Travelers should be granted discretion to establish

the amount of the reserve. (Id. at 25-26.) Briscoe contends that genuine issues of material fact

remain in dispute regarding whether Travelers violated the implied covenant of good faith and

fair dealing "by failing to give good faith consideration to making advances". (Id. at 34.)

This Court shall address each of Briscoe's arguments in turn. Briscoe first contends that,

in performing the calculations to determine the Final Contingent Fee or the Estimation Fee, this

Court should deduct neither of the two reserves. (Pl.'s Memo. Opp'n at 41.) As explained

above, Briscoe offers several reasons why the reserves should not be deducted. (Pl.'s Br. Opp'n

at 11-14.) This Court, finds, however that the germane issues raised by Defendants' instant

motion are not whether the conditions for deducting the reserves have been satisfied or the

amounts of the reserves. Travelers' instant motion seeks summary judgment only on the limited

question of the elements of the Calculation Formulae. (See Defs.' Reply Memo. in Support of

Defs.' Renewed Mot. Partial Summ. J. at 6; see also infra n.3; and Hr'g Tr., March 17, 2005, at

31:21, hearing "Hr'g Tr.")

Briscoe concedes that, the language of the ADC provides for two reserves that will

be deducted from the Net Program Proceeds Amount in calculating the Final Contingent Fee and

the Estimation Fee.[2] (Hr'g Tr. at 11-12.) Briscoe's arguments challenge the appropriateness of

_____

[2] During oral argument on the instant motion, Briscoe agreed that the express language of the
ADC is clear and unambiguous as to the stated elements of the formulae. In response to the
Court's inquiry as to the inclusion of the two reserves in the Calculation Formulae, Briscoe
argued as follows:

Mr. Moloshok: I think the point we would make, it says you must take a $2 million

10

deducting the reserves. (Id.) Travelers' motion for summary judgment, however, "seeks only

confirmation of the elements of the [Calculation Formulae]." (Defs.' Reply Memo. In Supp.of

Defs.' Renewed Mot. Partial Summ. J. at 5.) Because Travelers' current motion for summary

judgment seeks only to establish the elements of the Calculation Formulae,[3] this Court finds that

there is no cause to reach the secondary issues raised by Briscoe, including the impact, in any, of

alleged breaches of the ADC, the amount of the discretionary reserve, and Travelers' discretion

---

reserve. And the question is, if circumstances for reserving are not present, then that's an
issue that either is an ambiguity, or your Honor can determine as a matter of law this,
potentially, that the circumstances for reserving have not been met.

The Court: But whether the circumstances for reserving have been met or have not been
met doesn't speak to the issue at hand, because the issue at hand is only whether 9.4 is,
number one, clear and unambiguous, and number two, whether the formula set forth is
one that should be applied.

\*   \*   \*   \*

The Court: Well, presumably, it will be for the jury to determine . . . the
appropriate resolution on the additional reserve . . . .from your standpoint . . . you'll
argue that the additional reserve should be zero.

\*   \*   \*   \*

Mr. Moloshok: That's our understanding, your Honor, yes.

The Court: So, then, I take it the bottom line is, you don't need a judicial determination
as to what the term "additional reserve" means. . . . But as far as what the formula should
be, this is what it is. So I take it you don't dispute that?

Mr. Moloshok: I do not dispute that.

The Court: Okay.

(Hr'g Tr., at 6-12.)

[3] As stated in Defendants' moving papers, "Travelers has specified that it does not now seek, or
argue for, summary judgment on the particular numbers to be plugged into the ADC [sic]
Formulas." (Defs.' Reply Memo. in Support of Defs.' Renewed Mot. Partial Summ. J. at 6.)

to set the amount of the discretionary reserve.

This Court finds that the language the ADC is clear and unambiguous. The ADC expressly states in Section 9.4(a) that "there shall be deducted" from the Net Proceeds Amount "a $2 million reserve" and "an additional reserve for any advance or payment, whether or not paid or accrued, or any contingent liability." (ADC ¶ 9.4.) Thus, this Court grants Travelers' motion for summary judgment on the issues of the inclusion of the $2 million reserve and discretionary reserve as elements in the Final Contingent Fee Formula and the Estimation Formula.

## II.    Non-Program Loans

The remaining Calculation Claim at issue in the instant motion involves Briscoe's claim that the non-program loans have been repaid in full as of June 1989 and that Travelers should be precluded from arguing that any debt on the non-program loans remains or attempting to collect interest on the non-program loans. (Pl.'s Memo. Opp'n at 41-47.) Briscoe posits that certain language from the Agency Opinion, certain provisions of the ADC, and New Jersey state precedent require this Court to conclude that Travelers must apply the net Program proceeds first to the minimum guarantee (a $3 million advance made to Briscoe at the start of the Program); then to the non-program loans, and thereafter, to the debt created by Briscoe's default under the LSA. (Id. at 41-42.) The collateral collected in excess of the minimum guarantee of $3 million and the non-program loans, Briscoe argues, should be credited to Briscoe and applied to its Final Contingent Fee. (Id.)

Briscoe argues that, because the non-program loans and the minimum guarantee of $3 million have been repaid, interest ceased to accrue on these elements of Briscoe's outstanding

12

debt by June of 1989.[4]  (Pl.'s Br. Opp'n at 35.)  Briscoe further argues that evidence

demonstrates and Travelers has agreed that, by 1989, there were sufficient funds to repay the

non-program loans and to begin paying advances to Briscoe.[5]

### A.   Application of Program Proceeds -Prioritization of Debt

Briscoe relies on certain language from Judge Wolin's Agency Opinion and posits that

Judge Wolin directed Travelers to apply the proceeds of the Program to repay Non-Program

Loans ahead of repaying the pre-existing debt created when Briscoe defaulted under the LSA.

(Pl.'s Memo. Opp'n at 41.)  Briscoe directs this Court to Judge Wolin's Agency Opinion, in

particular, the language explaining that "the cash generated by the disposition belongs to the

secured creditor [Travelers], who must apply the proceeds first to itself for the expenses of the

liquidation process, then the reduction of the debt."  (Hr'g Tr. at 31:2-3.)  As the owner of the

proceeds, Briscoe contends, Travelers must apply the proceeds to the debt "as we go along."

(Hr'g Tr., at 31:6.)  The non-program loans, Briscoe argues, must be repaid first because they

were intended to induce Briscoe to participate in the collection of the disposition of the assets.

(Id. at 31.)

Upon review of the law of the case, the provisions of the ADC, and relevant precedent,

this Court finds that Briscoe errs in its characterization of the non-program loans and any

---

[4]  Plaintiff further argues that Travelers "had sufficient net proceeds to [sic] fully repay the non-program loans with interest by June 1989" and that Travelers is inappropriately attempting to charge [Briscoe] more than $14 million in additional interest since June 1989.  (Pl.'s Br. Opp'n Defs.' Mot. Partial Summ. J. at 4; Hr'g Tr. 33:17-23.)

[5]  According to Briscoe, "[i]n 1989, after [Briscoe] collected and turned over to [Travelers] a $29 million recovery on its construction claims relating to the Las Vegas water treatment plan, [Travelers] and [Briscoe] were both aware that [Briscoe] likely had a positive estimated [Net Proceeds Percentage Amount] which [Travelers] would have to advance to [Briscoe] (or if failed to do so, would have to accrue interest on) as ¶ 9.4 mandated."  (Id. at 7.)

interest accruing thereunder. According to Briscoe, the non-program loans "are a cost of collection." (Hr'g Tr. 30:25.) Briscoe argues that the parties structured the ADC such that Briscoe would receive a fee at the end of the Program, but during the Program, Briscoe would receive credits for its participation in the disposition of Collateral.[6]

Briscoe's bifurcate its debt to Travelers, describing its debt to Travelers, the pre-ADC debt obligation arising from a default under the LSA and its debt obligation incurred during and following the creation of the ADC, as two distinct debts. Using this characterization, Briscoe theorizes that the ADC reflects the parties' intent that Collateral collected during the program would be applied to its non-program loans simultaneously or possibly in advance of repayment of the LSA debt. (Pl.'s Br. Opp'n at 34-36, 41-47.)

The Agency Opinion explains that

> there can be no dispute that once a debtor defaults on a secured loan, those assets must either be transferred to the secured creditor, or, in the words of the Uniform Commercial Code, be 'disposed of' for reduction of the debt. Accordingly, the UCC makes clear that cash generated by the 'disposition' of collateral belongs to the secured creditor, who must apply the proceeds first to repay itself for expenses of the liquidation process and then to the reduction of the debt. The secured creditor must account to the debtor for any surplus; and the debtor remains liable for any deficiency. See, UCC 9-504; R.A. Anderson, The Uniform Commercial Code, § 9-504:198 at 585 (3d ed. 1994) ("When the proceeds of sale are not sufficient to pay the debt of the secured creditor who has priority, the creditor is entitled to keep all of the proceeds.").

> These principles govern the instant lawsuit. Briscoe defaulted under the Loan and Security Agreement. The money deposited under the

---

[6]     Mr. Moloshok: . . . our fee may have to wait until they know what the total outcome of the program was. But the payment of the costs of the collection and the loan and the debt are happening as the proceeds are coming in. And its happening out of the proceeds and not out of Briscoe's fee[.]

(Hr'g Tr., at 30:3-7.)

> ADC was not collateral but was the proceeds of the liquidation of
> Briscoe's assets. As such, the money deposited under the ADC
> belongs to Travelers who must apply the money first to cover its
> expenses and loans to Briscoe and then to the debt. If there is a
> surplus, Travelers must account to Briscoe. If there is a deficit,
> Travelers will forbear.

Frank Briscoe Co., Inc. v. Travelers Indem. Co., 899 F. Supp. 1304, 1333 (D.N.J. 1995)

(footnote omitted).

First, this Court notes that Judge Wolin was paraphrasing the provision of the UCC

above. Judge Wolin's explanation is a general acknowledgment of the well-established principle

that a secured creditor will deduct its costs from the disposition and apply the remaining portion

to the debtor's outstanding obligation. Briscoe incurred debt on at least two separate occasions

as relates to the pre-ADC debt and the debt incurred upon and after the creation of the ADC.

There is no language in the Agency Opinion or precedent supporting the conclusion that

Travelers had an obligation to apply the collateral collected to one of the debts in advance of

applying the Collateral to repayment of the other debts. Briscoe's attempt to distort Judge

Wolin's ruling into a prioritization of the debt does not avail.

Second, Briscoe's argument presents a strained and inaccurate reading of Judge Wolin's

ruling. Briscoe's argument regarding the simultaneous repayment of the pre-ADC debt, or the

debt incurred under the LSA, and the debt incurred subsequent to its default under the provisions

of the LSA is untenable. The self-described purpose of the ADC Program is to liquidate the

Collateral of the Briscoe Company to repay Travelers under the pre-existing LSA. While parties

disagree regarding the purpose of the non-program loans,[7] there is no dispute that Briscoe

---

[7] Briscoe argues that the purpose of the non-program loans was to aid in the collection of the
Collateral. (Pl.'s Br. Opp'n at 7 (the purpose of the non-program loans was "to try to collect . . .
debt [incurred under the LSA]").) Travelers argues that the non-program loans, as their

15

incurred the non-program loans after it defaulted on the LSA.

For this Court to adopt Briscoe's interpretation, this Court would have to disregard the express language of the ADC.  As Judge Wolin aptly noted, pursuant to ¶ 12.5, "[p]ending the collection and/or disposition of all of the Collateral, Travelers shall have the absolute and unlimited right to possess and utilize as its own all of the proceeds, including cash proceeds, received from the collection and/or disposition of the Collateral, . . . with [Briscoe] having no rights thereto[.]" Frank Briscoe Co., Inc., 899 F. Supp. at 1333.  The law of the case establishes that Travelers has "absolute and unlimited right" to apply the proceeds of the Program, in its discretion to Brisoe's outstanding debts.  Id.  Contrary to Briscoe's argument, nothing in Judge Wolin's Opinion or the ADC requires that this Court find that repayment of the non-program loans must be prioritized ahead of repayment Briscoe's pre-existing debt; the debt that was created by Briscoe's default of LSA.

As Judge Wolin noted in the Agency Opinion, "Travelers owns the money deposited under the ADC as a secured creditor.  Any interest earned on the money after it was deposited is the sole and exclusive property of Travelers." Id. at 1316.  In addition, Judge Wolin noted,

> [b]efore leaving its discussion of the language of the ADC, the Court must consider whether any provisions of the Uniform Commercial Code ("UCC") alter the Court's interpretation.  The parties agree that, in the absence of a contrary writing, the UCC governs this transaction.  In fact, Mr. Larner testified that when drafting the ADC he relied on the UCC.  Specifically, Briscoe claims that the ADC is governed by Article 9 of the UCC which provides:
>
> *    *    *    *    *    *

---

description suggests, were for non-program purposes. (Defs.' Memo. Support Mot. for Partial Summ. J. at 3. ("Non-Program Loans were, manifestly, for Non-Program purposes.  In other words, Non-Program Loans (as opposed to Program Advances) were intended to respond to Briscoe's . . . needs and/or desires.").)

16

> (1) A secured party must use reasonable care in the custody and
> preservation of collateral in his possession. In the case of an
> instrument or chattel paper reasonable care includes taking necessary
> steps to preserve rights against prior parties unless otherwise agreed.
>
> (2) Unless otherwise agreed, when collateral is in the secured party's
> possession;
>
>> (a) reasonable expenses (including the cost of any insurance and
>> payment of taxes or other charges) incurred in the custody,
>> preservation, use or operation of the collateral are chargeable
>> to the debtor and are secured by the collateral;
>>
>> (b) the risk of accidental loss or damage is on the debtor to the
>> extent of any deficiency in any effective insurance coverage;
>>
>> (c) the secured party may hold as additional security any increase
>> or profits (except money) received from the collateral, but
>> money so received, unless remitted to the debtor, shall be
>> applied in reduction of the secured obligation;
>>
>> (d) the secured party must keep the collateral identifiable but
>> fungible collateral may be commingled;
>>
>> (e) the secured party may repledge the collateral upon terms which
>> do not impair the debtor's right to redeem it.
>
> (3) A secured party is liable for any loss caused by his failure to meet any
> obligation imposed by the preceding subsection but does not lose his
> security interest.
>
> (4) A secured party may use or operate the collateral for the purpose of
> preserving the collateral or its value or pursuant to the order of a court
> of appropriate jurisdiction or, except in the case of consumer goods, in
> the manner and to the extent provided in the security agreement.

Frank Briscoe Co., Inc., 899 F. Supp. at 1316 (citation omitted).

While the language from the UCC indicates that proceeds from a liquidation by a secured

creditor must be applied to the debt, there is certainly no requirement that a debtor having

incurred a series of debts on separate occasions may assert to the creditor which debts must be

satisfied ahead of others. Moreover, Briscoe's argument that Judge Wolin's ruling enumerates

an order prioritizing its debts presents a gross distortion of the language of Judge Wolin's

opinion. The language from the opinion clearly seeks only to list the central elements of the

outstanding debt. As Judge Wolin explains in the preceding sentences, Travelers owns the

17

collateral raised by the disposition of assets and the sums collected should, at Travelers' discretion, be used, to cover its expenses and applied to Briscoe's loans and debt.  Had Judge Wolin intended the listing to be a prioritization, he would have indicated such by enumerating the list or stating that the listing reflected the intended order of repayment.

To buttress the argument that Judge Wolin's Agency Opinion requires a certain ordering or prioritization of the debts to be repaid, Briscoe directs this Court to two recent New Jersey appellate court decisions, City of Orange Township v. Empire Mortgage Services, Inc., 341 N.J. Super. 216 (App. Div. 2001) and Metlife Capital Financial Corp. v. Washington Avenue Associates L.P., 313 N.J. Super. 525 (App. Div. 1998), aff'd 159 N.J. 484 (1999).  (Pl.'s Br. Opp'n 42-47.)  Briscoe argues that, "even if the proceeds were 'technically' owned by [Travelers], they were, functionally the means that [Travelers] was to be paid back for the [non-Program] loans."[8]  (Pl.'s Br. Opp'n 45.)

Neither precedent identified by Briscoe supports the proposition for which it is relied upon.  In Met Life, a debtor challenged a creditor's attempt to collect interest on a debt that had been fully satisfied.  313 N.J. Super. at 527.  The Appellate Division noted that the binding agreement between Met Life and the debtor expressly stated that Met Life was obligated "to apply the [rents], less costs and expenses . . . to the payment of any of the Secured Obligations, *in such order as Grantee may determine.*"  Id. at 527 (emphasis added).  Thus, the agreement between the parties in Met Life specifically provided for the debtor to have the authority to

---

[8] As discussed supra, Briscoe further argues that since the loans have been repaid, interest may no longer accrue on the non-program loans. (Id.)

18

prioritize the debts for the purpose of repayment of the obligation.[9]

The ADC clearly provides for Travelers to have exclusive rights to the Collateral until the end of the program. (ADC ¶ 12.5.) Briscoe's argument seeks to divest Travelers of rights expressly granted by the ADC. This Court finds that repayment of the debt, that which was pre-existing at the time of the creation of the ADC and that which was incurred contemporaneously or following the execution of the ADC, is a matter soundly left to Travelers' discretion, as provided under the ADC.

**B.      Interest and Aggregate Amount of Non-Program Loans**

The final issue raised by Briscoe's Calculation Claims in the instant motion addresses whether interest accrues on non-program loans. The term "aggregate amount" in Section 9.4 of the ADC, Briscoe contends, does not include interest. (Pl.'s Memo. Opp'n at 37.) Briscoe argues that Travelers should not be permitted to reduce the amount of the estimate in the Estimation Formula and the Final Contingent Fee Formula for any alleged interest owed under Section 10.3 of the ADC. (Id.) According to Briscoe, because Section 9.4 (b)(iii)-(iv) only specifically reference non-program loans "as provided in" Sections 10.1 and 10.2 of the ADC, but do not reference Section 10.3 of the ADC, the term "aggregate amount" must be interpreted to exclude interest. (Id. at 36.)

_____

[9]  Similarly, City of Orange does not impact this Court's findings. 341 N.J. Super. at 219-20. First, City of Orange, is distinguishable on its face, noting that it involves a taking of private property through the process of condemnation. In City of Orange, a government entity condemned private property that was subject to a mortgage and deposited with the court an estimated amount of just compensation that exceeded the outstanding mortgage note balance. Id. at 222-23. Second, and apart from the obvious distinctions in the areas of law at issue, in City of Orange the monies deposited by the government entity were *in excess of* the balance of the mortgage note. Id. (emphasis added). Briscoe has not argued, nor could it argue, that at an identifiable moment prior to the end of the Program, the collection of Collateral by Travelers was *in excess* of Briscoe's obligations.

Briscoe directs the court to the Agency Opinion and posits that the Agency Opinion held that any omission in the ADC of language regarding interest on the non-program loans was intentional and reflects the parties' deliberate agreement. Frank Briscoe Co., Inc., 899 F. Supp. at 1314. "[S]ince interest is not expressly provided for in Section 9.4 of the ADC," Briscoe argues, "it cannot be deducted" in relation to the non-program loans. (Pl.'s Br. Opp'n at 36.) Briscoe further argues that Judge Wolin has held that interest should be charged under the ADC only where it is specifically provided for. (Id.)

This Court finds that the term "aggregate amount," as used in Section 9.4, refers to the principal and interest on the non-program loans. Briscoe's attempt to segregate section 10.3 from the whole of the agreement and to treat with distinction the non-program loans does not avail. To reach the conclusion that Briscoe proffers, this Court would have to disregard the law of the case and find that Sections 10.1 and 10.2 function in a manner wholly distinct from Section 10.3.

Sections 10 of the ADC contains 3 sub-parts, 10.1, 10.2, and 10.3. The language in Section 10.3 discuss the loans governed by the Section generally. (ADC ¶ 10.3.) Section 10.3 states in relevant part, "for a period of eighteen (18) months from the Effective Date, any loans shall not bear interest but shall thereafter bear interest at the rate of fifteen (15%) percent per annum payable with the principal of the loan." (ADC ¶ 10.3.) The general applicability of the terms in Section 10.3 to all of the loans covered in the section is evident from the express language in the provision. Section 10.3 states that "any loans made hereunder shall be evidenced by a promissory note payable to the order of Travelers." (ADC ¶ 10.3.) To dissect this section and sever sub-part 10.3 from the other sub-parts of the section would be illogical, and contrary to

basic principles of contract construction.  This Court declines Briscoe's invitation to redraft the

ADC and redistribute the bargained for benefits of the ADC.

## CONCLUSION

Having reviewed parties' submissions, the law of the case, relevant provisions of the

ADC, and applicable precedent, this Court grants Travelers' motion for summary judgment on

the elements and formulae to be used to determine the Calculation Claims.  This Court concludes

that the fixed and discretionary reserves remain elements to be considered and calculated in

determining the Estimation Fee and the Final Contingent Fee, that application of the proceeds of

the Program, while subject to all relevant precedent, shall be at Travelers' discretion.

JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated: August 23, 2005

21