<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

| | | |
|---|---|---|
| _____ | : | |
| Frank Briscoe Company, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Civil Action No.  93-5222 (JAG) |
| | : | |
| The Travelers Indemnity Company | : | |
| and The Travelers Companies, | : | |
| | : | **OPINION** |
| | : | |
| Defendants, | : | |
| | : | |
| Gabriel R. Calafati, | : | |
| | : | |
| Additional Defendant | : | |
| on Counterclaim. | : | |
| _____ | : | |

<u>GREENAWAY, JR., U.S.D.J.</u>

This matter comes before the Court on motions for partial summary judgment, pursuant

to FED. R. CIV. P. 56(c), by Defendants The Travelers Indemnity Company and The Travelers

Companies (collectively "Travelers" or "Defendants").  This is an ongoing contractual dispute

between Plaintiff, Frank Briscoe Company, Inc. ("Briscoe" or "FBC" or "Plaintiff") and

Travelers.  This Court, along with Courts preceding it in this litigation,[1] has issued Opinions and

Orders in this matter which include <u>Frank Briscoe Co., Inc. v. Travelers Indem. Co.</u>, 899 F.

Supp. 1304 (D.N.J. 1995) (the "Agency Opinion") and <u>Frank Briscoe Co., Inc. v. Travelers</u>

_____

[1]  In this Opinion, "this Court" is used to refer to both Judge Greenaway and Judge Wolin.

1

Indem. Co., 65 F. Supp.2d 285 (D.N.J. 1999) (the "Summary Judgment Opinion").

Travelers now moves for partial summary judgment on its Pension Plan Counterclaim and on Briscoe's defenses to the remaining counterclaims in Travelers' Third Amended Answer and Counterclaim with Jury Trial Demand.  Briscoe has cross-moved to strike the expert report of Michael J. Samet and filed a Request for Judicial Notice, pursuant to Fed. R. Civ. P. 201(b) and 201(d), on the following issues: 1) inflation in the years after 1972 substantially reduced the value of a dollar, as reflected by changes in the Consumer Price Index ("CPI") calculated by the United States Department of Labor, Bureau of Labor Statistics ("BLS"); 2) inflation between 1972 and 1986 reduced buying power of the dollar in the United States by more than half and inflation between 1972 and 2005 reduced the buying power of the dollar by more than 75 percent; and several additional points as to the maintenance and authority of BLS records and statistics.  (Pl.'s Request for Judicial Notice, at 1-3.)  Finally, on the eve of oral argument on the instant motions and cross-motion, in correspondence dated July 22, 2005, Briscoe petitioned this Court to defer consideration of all of the above-described pending motions until the Court rules on the in limine motions enumerated in the same letter.  (Pl.'s Letter of July 22, 2005, at 2.)

For the reasons set forth below, this Court denies Plaintiff's request for the Court to defer consideration of the motions currently before the Court until the resolution of certain of Briscoe's in limine motions; denies Plaintiff's request that the Court take judicial notice of changes in the inflation rate, pursuant to the Consumer Price Index calculated by the United States Department of Labor, Bureau of Labor Statistics; denies Plaintiff's cross-motion to strike the expert report of Defendants' expert, Michael J. Samet; grants Defendants' motion for summary judgment on the issue of the Pension Plan Counterclaim; and grants Defendants' motion for partial summary judgment on Plaintiff's defenses to Defendants'  remaining

counterclaims.

## STANDARD

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994); Nat'l State Bank v. Fed. Reserve Bank of N.Y., 979 F.2d 1579, 1581 (3d Cir. 1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof

3

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).  In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences – including on issues of credibility– in favor of the non-moving party. Watts v. Univ. of Del., 622 F.2d 47, 50 (3d Cir. 1980).

## ISSUES BEFORE THE COURT

This matter arises in the context of a lengthy contract litigation between Briscoe and Travelers; the history has been detailed in prior Opinions.  It is sufficient to note here that Briscoe and Travelers are parties to the 1982 Agreement for Disposition of Collateral (the "Program" or "ADC.")

Much of the dispute over the Pension Fund Counterclaim attempts to relitigate previously settled issues.  This Court has previously entered several Opinions and Orders in this matter. The law of the case doctrine governs the disposition of the motions presented.  This doctrine militates against re-deciding issues of law previously resolved in the same case, either expressly or by implication.  Public Interest Research Group of N.J., Inc. v. Magnesium Elecktron, Inc., 123 F.3d 111, 116 (3d Cir. 1997).  As the Third Circuit has indicated, there are "extraordinary circumstances" that warrant a court's reconsideration of an issue decided earlier in the course of litigation.  Id. at 116-17.  These circumstances include when "new evidence is available; . . . a supervening new law has been announced; or . . . the earlier decision was clearly erroneous and would create manifest injustice."  Id. at 117.  This Court finds that the law of the case in this instance includes (1) the Agency Opinion and the express and implied findings therein; (2) the

denial of reconsideration of the Agency Opinion; (3) the Summary Judgment Opinion; (4) the denial of reconsideration of the Summary Judgment Opinion; and (5) the Orders and Opinions of this Court entered subsequently to these Opinions.

The Frank Briscoe Company, Inc. maintained a qualified, tax-exempt, defined benefit pension plan for its non-union employees (the "Plan" or "Briscoe Pension Plan"). (Decl. Gabriel Calafati in Opp'n to Defs.' Mot. Partial Summ. J. on Remaining Issue of Pension Plan Countercl. and on Pl.'s Defenses to Defs.' Remaining Countercl., hereinafter "Calafati Decl.," at ¶ 5.)

The Briscoe Company, Inc. ("BCI") is a separate entity, a construction company established during the Program. Mr. Calafati, President of the Frank Briscoe Company, Inc., became the exclusive owner and sole controlling person of BCI. (Defs.' Br. at 6.) Defendants allege that BCI employed former Briscoe employees, including Gabriel Calafati's two sons and brothers. (Id.) Defendants further allege that BCI was sharing space, equipment, and personnel with Briscoe and that Briscoe diverted the residual assets that constituted the overfunding of the Briscoe Pension Plan and used those assets to fund the BCI Pension Plan. (Id.)

In late 1987, Briscoe amended the Briscoe Pension Plan so as to update the formula of benefits accrual for remaining staff and give a "'past service credit' to the loyal employees who were being asked to remain in an uncertain environment." (Pl.'s Br. Opp'n at 6.; Calafati Decl. ¶¶ 29-30.) Again in 1991 and 1997, Briscoe amended the plan. (Pl.'s Br. Opp'n at 6.) According to Briscoe, it amended the plan based on the recommendation of its actuaries and its assessment at the time as to the effects of inflation, the income from plan assets, and the need to retain key staff for work required by the ADC program. (Pl.'s Br. Opp'n at 7.)

The Briscoe Pension Plan provides that, upon termination of the Plan, residual assets

"remaining after the satisfaction of liabilities of the Plan shall be distributed to Frank Briscoe Company, Inc." (Declaration of Matthew Moloshok in Opp'n to Defs.' Mot. Partial Summ. J. on Remaining Issue of Pension Plan Countercl. and on Pl.'s Defenses to Defs.' Remaining Countercl., hereinafter "Moloshok Decl.," Ex. A, Frank Briscoe Company, Inc. Pension Plan, as Amended and Restated, Jan. 1, 2000, (the "Briscoe Pension Plan") at ¶ 9.3.)

Travelers alleges that, since the early 1980's, the Plan was overfunded, meaning the assets were greater than the value of the liabilities. Travelers argues that the overfunding of the Pension Plan "was an intangible asset of Briscoe and, hence, an item of Travelers' Collateral under the ADC." (Statement of Material Facts in Support of Defs.' Mot. Partial Summ. J. at ¶ 19.) Travelers argues that "Briscoe's application of the Briscoe Pension Plan Overfunding to fund the pensions of [the employees of the Briscoe Company, Inc.] was an improper diversion of Travelers' Collateral. Travelers seeks to compel Briscoe to repay the amount of the overfunding. Defendants further contend that the only remaining issue with regard to the alleged diversion is quantification of the amount of overfunding which should be repaid. Travelers has submitted to the Court the expert report of Michael J. Samet, which quantifies the alleged funding diversions.

Travelers further alleges that Briscoe intentionally acted to divert the overfunding of the Plan by: "(a) inclusion of BCI in the Briscoe Pension Plan . . . (b) inclusion of accruals for individuals who did not meet the hours of service thresholds . . . (c) five separate, and post-ADC, gratuitous amendments to the Briscoe Pension Plan, which halved the hours required for accruals by eliminating all integration with Social Security, and allowed employees who reached the age of 65 to collect pension benefits even if they continued to work . . .(d) inclusion of accruals

based on overstated reports of pensionable earnings, improperly encompassing fringe benefits and income attributable to group life insurance benefits."  (Defs.' Mot. Partial Summ. J. at 26-27.)

Briscoe argues that 1) Travelers knew of the overfunding and delayed in bringing this action, which should be denied under the theory of laches; 2) Briscoe, acting as Travelers' agent, had the authority, as Plan Administrator, to carry out each of the actions that are alleged to constitute diversion; 3) Briscoe's acts in the course of administration of the Plan were "ordinary and prudent;" 4) Travelers' silence constituted acquiescence to Briscoe's use of the overfunding; 5) Briscoe's use of the overfunding of the Plan created additional wealth for Travelers in two ways: a) by motivating former Briscoe employees to participate enthusiastically in the Program collecting the Collateral owed to Travelers; and b) by placing the overfunding in a tax free investment vehicle that yielded more than Travelers would have obtained if the Plan had been liquidated in the 1980's.

Briscoe argues that genuine issues exist as to material facts, precluding summary judgment as to whether Briscoe's actions constitute misappropriation of the overfunding of the Plan.

Briscoe and Travelers strongly dispute the interpretation of the law of the case as to the Pension Plan Counterclaims.  Travelers contends that the law of the case establishes that the overfunding is Collateral, an asset owed to Travelers, and that it was never in Briscoe's discretion to redirect the overfunding to the "former employees," namely Mr. Calafati, his two sons, and his brother.  Travelers further contends that Briscoe's arguments regarding implied consent are undermined by the express provisions of the ADC requiring Briscoe to obtain

permission from Travelers before liquidating, disposing of or distributing any collateral.

**I.**     **Travelers' Motion For Summary Judgment on its Pension Plan Counterclaims**

    **A.**     <u>**Law of the Case**</u>

This Court has repeatedly addressed the issue of whether the pension plan assets fall within Collateral, as defined by the ADC.  At the oral argument held May 28, 1996, Judge Wolin considered Travelers' application for an order restraining Briscoe from continuing to divert assets from the overfunded Briscoe employees' pension plan to the BCI employees' pension plan.  Judge Wolin granted Travelers' petition and found that the

> overfunding is an intangible asset.  The Briscoe pension plan provides that any residual assets of the plan remaining after the satisfaction of all liabilities of the plan shall be distributed to the company.  The intangible assets are ADC collateral, as set forth in the agreement.   The overfunding is being used to fund the pensions of BCI employees.  The Court will grant [sic] Traveler's motion to restrain any further diversion of the overfunding and to provide access to all documents and information within Briscoe's possession, custody and control regarding the plan.

(Tr. Hr'g,  May 28, 1996, at 12:1-12.)

Following the entry of Judge Wolin's Opinion and Order on the record on May 28, 1996, two plan participants, Christopher Kelly and Martin Jacobsen, filed a motion seeking to intervene.  A decision by then-United States Magistrate Judge Joel Pisano reviewed Judge Wolin's ruling and denied the intervenors' motion.  (Magistrate Pisano, Opinion on Motion of Christopher Kelly and Martin Jacobsen to Intervene (the "Pisano Opinion"), Nov. 19, 1996.)  In explaining his rationale for denying the intervenors' motion, Judge Pisano noted that "[t]he practical meaning of Judge Wolin's May 28, 1996 ruling is that any Plan overfunding should be restrained.  The amount of the reversion is an intangible asset which is then collectible under the ADC by Travelers." (<u>Id.</u> at 5.)

In reviewing Judge Wolin's ruling on the Briscoe Pension Plan overfunding, Magistrate Judge Pisano found that "[t]he effect of Judge Wolin's May 28, 1996, ruling that the Plan overfunding was an item of ADC collateral is that Briscoe now may not continue to overfund the Plan and must pay back the amount of the overfunding to Travelers."  (Id. at 7.) Moreover, Judge Pisano concluded that "the clear meaning of Judge Wolin's ruling is to require that Briscoe reimburse to Travelers the amount of any overfunding which may be found." (Id. at 8.)

During oral argument before this Court on October 29, 1998, Briscoe agreed that some kind of accounting proceeding was required to determine the value to be repaid to Travelers. (Hr'g Tr. Oct. 29, 1998, at 160, line 2-8.)  During the hearing on October 29, 1998, Briscoe acknowledged that it "understood from Judge Pisano's order of November 1996 that there would be some kind of accounting proceeding to determine how much has to be paid over or adjusted on order to deal with this issue."  (Hr'g Tr. Oct. 29, 1998, at 160, lines 4-7.)

This Court's Order dated November 9, 1999, reviewed and affirmed the Court's Order and Opinion entered earlier the same year stating that: "it appearing that this Court entered an Opinion dated July 6, 1999, and an Order dated June 30, 1999, which, among other things, denied Plaintiff's motion for summary judgment as to Counts Three, Nine and Ten of Defendants' counterclaim and also as to Defendants' claims concerning the overfunding of the Pension Plan." (Order dated November 9, 1999, at 1.)

The numerous decisions of this Court on the Pension Plan Counterclaim are well-stated in this Court's Summary Judgment Opinion, which noted that:

> [a]t a court hearing on May 28, 1996, Judge Wolin found that (1) the
> Briscoe Pension Plan was overfunded, i.e., the value of the assets of the Plan

exceeded its liabilities, (2) the overfunding was being applied to benefit an entity named Briscoe Company, Inc. ("BCI"), [and] (3) the overfunding was collateral under the ADC belonging to Travelers . . . .

65 F. Supp. 2d at 292 (footnote omitted).

In light of the parties' submissions and this Court's review of the law of the case, the central issue before this Court now appears to be which, if any, of Briscoe's acts directing the use of the overfunding constituted diversion. This Court begins by examining the value of assets referred to as "overfunding;" thereafter, this Court explores the parameters of the agency relationship as set forth in Judge Wolin's Agency Opinion, and Briscoe's arguments that its use of the overfunding was in the ordinary and prudent administration of the Briscoe Pension Plan and motivated by a desire to facilitate collection of the Collateral; finally, this Court considers various arguments Briscoe raises regarding Mr. Samet's expert report.

## B.    Defining Overfunding

Briscoe argues that the amendments to the Plan and the use of the overfunding did not require Travelers' approval because it did not involve any "new money." As Mr. Moloshok noted during oral argument on the instant motion, "[b]asically, all of the provisions that [Travelers] cited, where we have to ask them for money, it deals with asking them for new money, not asking for what we should do with stuff that we already said is going to apply for particular purposes." (Hr'g Tr., July 25, 2005 at 25:23-25; 26:1-2.)

According to Briscoe, the assets in the Plan belonged to Briscoe and were available for Briscoe's use unless and until the Plan was liquidated. Briscoe's argument suggests that the value of the overfunding could be used at Briscoe's discretion[2] unless there was a

_____

[2] Mr. Moloshok: "[i]f Briscoe had taken program proceeds and diverted them into the pension plan as contributions for the purpose of funding BCI, that would be a diversion. But nobody

liquidation and the balance of the overfunding was distributed to Briscoe, at which point, the assets would not have been distributed to Briscoe, but to Travelers as part of the Collateral.

Travelers' right to the pension plan overfunding is clearly established in the law of the case. As noted, Judge Wolin found that "[t]he Briscoe pension plan provides that any residual assets of the plan remaining after the satisfaction of all liabilities of the plan shall be distributed to the company. The intangible assets are ADC collateral, as set forth in the agreement." (Tr. Hr'g, May 28, 1996, at 12:1-12.) The law of the case requires a finding that overfunding be defined as all of the residual assets not required to satisfy the liabilities of the Briscoe Pension Plan. This definition does not create the illusion of ownership based on the status of the Plan (overfunded or underfunded), as Briscoe suggests. In fact, by defining the overfunding as "any residual asset" remaining after the satisfaction of liabilities, Judge Wolin clearly found that the assets which constitute overfunding belong to Travelers no matter whether the Plan status was effective or terminated.

Briscoe has made numerous attempts – and continues to do so –  to escape this clear and simple determination made nearly a decade ago. This Court has consistently held that all assets in excess of those needed to satisfy the Briscoe Pension Plan liabilities must be considered Collateral; therefore, pursuant to the ADC and the law of the case, these assets belong to Travelers. In a restatement of Judge Wolin's finding, this Court noted that, "[a]t a court hearing on May 28, 1996, Judge Wolin found that (1) the Briscoe Pension Plan was overfunded, i.e., the value of the assets of the Plan exceeded its liabilities, (2) the

---

ever could say that it was improper, immoral, unlawful or a violation of Briscoe's authority to use the pension plan to pay benefits for Frank Briscoe Company employees.
(Hr'g Tr. July, 25, 2005 at 17:1-6.)

overfunding was being applied to benefit an entity named Briscoe Company, Inc. ('BCI'), [and] (3) the overfunding was collateral under the ADC belonging to Travelers[.]"  65 F. Supp. 2d at 292 (footnote omitted).

Finally, Magistrate Judge Pisano's ruling clearly stated that Briscoe "may not continue to overfund the Plan and must pay back the amount of the overfunding to Travelers[,]" indicating two significant characteristics of the overfunding.  First, by stating that Briscoe could not continue to overfund the Plan, Judge Pisano correctly established that the overfunding began in the instance that Plan assets exceeded Plan liabilities.  Second, in noting that Briscoe must repay the overfunding, Judge Pisano affirmed Judge Wolin's conclusion that the overfunding must be understood as Collateral from the point at which assets of the Plan exceed the liabilities of the Plan.  (Pisano Opinion at 7.)

Even Briscoe's responsive papers in the instant motion reflect Briscoe's understanding that the term overfunding refers to "the difference in the value between Plan assets and the liabilities owed to FBC personnel."  (Pl.'s Cross-Motion to Strike at 3.)

Therefore, this Court concludes that overfunding includes any assets of the Briscoe Pension Plan that exceeded the liabilities of the Briscoe Pension Plan at any time following the parties' entry into the ADC.

During oral argument on the instant motions, Briscoe described this Court's ruling regarding the overfunding as limited to that value of the assets which exceeded liabilities in the Briscoe Pension Plan at the time of liquidation.  (Hr'g Tr., July 25, 2005 at 37.)  This description fails to acknowledge the assets that are the central issue in the present motions. This Court recognizes that the Briscoe Pension Plan has now been liquidated and that the

assets in excess of liabilities at the time of liquidation were properly released to Travelers, after accounting for appropriate expenses and taxes. The instant motions seek to resolve ownership questions regarding the assets that exceeded liabilities prior to liquidation, which includes assets removed from the Briscoe Pension Plan and used to create the BCI Pension Plan.

### C.   <u>Defining Diversion</u>

Briscoe argues that, even if the assets used to fund the BCI Pension Plan are considered "overfunding" that is due to be repaid to Travelers, this Court should excuse the use of the assets for certain identified purposes because Briscoe was justified as Travelers' agent in using the funds for these purposes.  Briscoe contends that Travelers misstates the law of the case and that its interpretation of "diversion" is far too broad.  Briscoe contends that, under Travelers' interpretation, all uses of the overfunding, save the task of satisfying the Briscoe Pension Plan liabilities, would constitute diversions.  In short, Briscoe argues that the amendments to the Briscoe Pension Plan creating, enhancing, and sustaining the BCI Pension Plan were performed in the prudent and ordinary operation of the Plan and, therefore, such acts should not constitute diversion of the overfunding.

Briscoe concedes that the central question before this Court in deciding the instant summary judgment motions is whether Briscoe was "authorized or not to incur liabilities and change liabilities with respect to employees?"  (Hr'g Tr., July 25, 2005 at 30:22-23.)  Briscoe contends that the Court's 1996 rulings left a single issue unresolved: "whether the particular liabilities incurred were appropriately incurred."  (Pl.'s Cross-Motion to Strike at 5.)  Briscoe argues that this Court has not held or ruled that "the use of plan assets to provide benefits to

FBC employees as part of their salary and benefits for performing the program was a 'diversion.'" (Id.)  Briscoe posits that this Court "was never asked to rule and did not rule, . . . that provision of benefits to [Briscoe] personnel incident to, and to motivate their performance of, the ADC program was in any sense a 'diversion.'" (Pl.'s Cross-Motion to Strike at 6.)  Briscoe argues that "[w]hether the increased post-1986 liabilities for [Briscoe] personnel were appropriately incurred is a fact question."  (Id.)

Travelers argues that Briscoe acted to divert the overfunding of the Pension Plan, through "(a) inclusion of . . . BCI in the Briscoe Pension Plan . . . (b) inclusion of . . . accruals for individuals who did not meet the hours of service thresholds . . . (c) [adopting] five separate, and post-ADC, gratuitous amendments to the Briscoe Pension Plan, which halved the hours required for accruals,  . . . increased pension accruals by eliminating all integration with Social Security, and allowed employees who reached the age of 65 to collect pension benefits even if they continued to work . . .[and] (d) inclusion of accruals based on overstated reports of pensionable earnings, improperly encompassing fringe benefits and income attributable to group life insurance benefits," were beyond the ambit of Briscoe's authority as Travelers' agent.  (Defs.' Br. at 26-27.)

Travelers presents the expert report of Michael J. Samet, which explores in detail six alleged methods of diversion.  (Affidavit of Michael J. Samet in Supp. Travelers' Mot. for Partial Summ. J. on the Remaining Issue of the Pension Plan Counterclaim and in Opp'n to Pl.s' Cross-Motion to Strike His Expert Report and Briscoe's Request for Judicial Notice of Certain Statistics.)  Plaintiff has challenged the admissibility of Mr. Samet's report, as addressed below.

Briscoe argues that its decisions to transfer the overfunding of the Briscoe Pension Plan to the BCI Pension Plan were reasonable and prudent.  Briscoe offers the following explanations in support of its contention that the amendments to the plan and other alleged acts of diversion were prudent and ordinary in the course of maintaining the Briscoe Pension Plan.

### 1.    Motivate and Retain Key Employees

First, Briscoe argues that Travelers understood that the overfunding would be used to provide benefits to Briscoe personnel.  (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. at 4; Calafati Decl. at ¶ 20.)  Briscoe contends that Travelers was aware of the participation of Mr. Calafati and his sons, "whose performance was central and instrumental in the extraordinarily successful performance of the Program."  (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. at 4.) Briscoe argues that Travelers "insisted on" Mr. Calafati remaining in a leadership role at the Company and working to motivate the employees and to "keep [Briscoe's] employees in place and to maintain their energy and enthusiasm in performing this complex program." (Pl.'s Br. Opp'n at 4-5.)

Briscoe further argues that Travelers encouraged the retention of the employees covered by the BCI Pension Plan.  Briscoe argues that if the contributions to the BCI Pension Plan were intended to benefit employees and further the Program, Briscoe's acts cannot be found to constitute diversion.  (Hr'g Tr., July 25, 2005 at 16:23-25.)  Furthermore, Briscoe contends that the amendments increasing benefits were warranted because inflation increased 250 percent between 1980 and 1986.  (Hr'g Tr., July 25, 2005 at 18:5-9.)  Briscoe further contends that "it was not rational to leave money sitting there that could only be applied for

the benefit of the employees."  (Hr'g Tr., July 25, 2005 at 18:7-9.)

Mr. Calafati notes that Briscoe was "able to provide improvements to benefits
through past service credits and changes to the formulae that would enable [Briscoe] to retain
and motivate staff . . . simply by using the growth in the Plan assets for its disclosed and
intended purpose: to pay retirement benefits to the plan participant."  (Calafati Decl. at ¶ 22.)
Mr. Calafati further argues that "[k]eeping the core group of employees together would have
been impossible if promised pension benefits . . . eroded substantially."  (Calafati Decl. ¶
24).  According to Mr. Calafati, certain key employees had left Briscoe and he "was not
prepared to run that risk with the others."  (Calafati Decl. at 24.)

Finally, Briscoe refers this Court to a report by Mr. James M. Peters, a Travelers
officer, who was responsible for reporting periodically on the status of the Program.  Briscoe
notes that Mr. Peters stated in his December 1989 report, "Large Loss Report," that "it was
necessary to retain and motivate management and staff to continue the claims and collateral
disposition work . . . . for the past seven years, this group . . . . has served to reduce our
present advances to the point that Travelers has a surplus cash portion of $2MM."  (Pl.'s Br.
Opp'n at 4-5 (citation omitted).)  Briscoe also relies upon correspondence between Briscoe
and Travelers regarding Briscoe's discretion to employ whomever it pleased and in
accordance with the terms and conditions that it had negotiated.[3]

---

[3] Briscoe cites correspondence from Robert Green, Travelers' Senior Vice President in 1991, that
states, "[t]his does not mean that you cannot continue to employ whatever Briscoe personnel
[Mr.Calafati] desired" and noting that such decisions were "completely within [Briscoe's]
discretion." (Calafati Decl. at ¶ 26, Ex. G, Ltr. Robert Green to Briscoe President, Gabriel R.
Calafati, dated April 6, 1991, stating "[w]e have no intent in, or intent to, control the destiny of
your organization."]

## 2.  Authority as Plan Administrator and Travelers' Agent

Second, Briscoe argues that, as Plan Administrator and Travelers' agent, it had authority to direct the distribution of assets under the Plan.  Pursuant to the Briscoe Pension Plan, the Plan administrator has discretion to retain or distribute the amount of the overfunding.  Briscoe further argues that the terms of the Briscoe Pension Plan permit amendments by the Plan Administrator.  Briscoe contends that Travelers knew of the Pension Plan and "knew that this plan authorized changes in benefit structure."  (Hr'g Tr., July 25, 2005 at 17.)

Briscoe argues that the terms of the Plan allow for amendments increasing benefits, pursuant to paragraph 8.2 of the Plan.  Paragraph 8.2 of the Plan states that "[Frank Briscoe Company] has designated Frank Briscoe Company, Inc. to carry out its fiduciary responsibilities and authority under the Plan (other than to manage and control Plan assets) and its duties as the Plan Administrator."  (Id. at ¶ 8.2.)  According to the Plan, the Plan Administrator has authority to amend the plan,[5] to determine contributions to the plan and the amounts of such contributions, to determine the amounts and timing of payments of benefits and the rights of and beneficiaries to the Plan, and take any actions necessary to assure timely payment of benefits under the Plan and full review of any person who is denied a claim to any benefit.[6]  (Id. at ¶ 8.2(a)-(c).)

---

[5]  An amendment to the Plan requires the approval of the Board of Directors.  (Id. at ¶ 8.2(a).)

[6]  Other provisions of the Plan provide that the Plan Administrator, defined by the Plan as Briscoe, will maintain records, communicate appropriate information to the Board of Directors, Members, and their beneficiaries, and submit required reports to appropriate authorities; select employment counsel to advise as to the provisions of the Plan; employ an enrolled actuary and an independent qualified public accountant; and "take any action necessary or appropriate to assure that the Plan is administered for the exclusive purpose of

Moreover, Briscoe argues "[i]t was understood by all that [Mr. Calafati] was to have full control of [Briscoe's] performance of the program" and of Briscoe's employees. (Calafati Decl., ¶ 25.) According to Mr. Calafati, Travelers informed him "that matters of who [Briscoe] could employ and their compensation were wholly in [Mr. Calafati's] discretion as [Travelers] was concerned only with minimizing additional advance to cover such costs as it might be called upon to make." (Id.) Travelers understood, Briscoe argues, that Mr. Calafati was free to make use of the Pension Plan assets for the purpose of employing and compensating the key Briscoe employees who were then serving as BCI employees. (Calafati Decl. at ¶ 25.)

### 3. Travelers Acquiesced to the Amendments

Third, Briscoe argues that Travelers acquiesced by its silence regarding the use of the overfunding. According to Briscoe, Travelers chose not to impose limitations on how Briscoe used and operated the Pension Plan until it moved in 1996 to restrain use of the plan to fund benefits for BCI employees. (Pl.'s Br. Opp'n at 4.) Briscoe posits that Travelers had an affirmative obligation to seek out information regarding the status of the Plan and any amendments or changes in the administration of the Plan.

Briscoe maintains that it informed Travelers about the Briscoe Pension Plan when negotiating the L&SA and the ADC. Briscoe argues that Travelers had a full-time monitor, Construction Management Associates ("CMA"), reviewing Briscoe's operations during the 1980's, and that Travelers knew of the Plan and its terms, including the liquidation and termination rights thereunder. (Calafati Decl. ¶ 11.) According to Briscoe, CMA's initial

---

providing benefits to Members and their beneficiaries in accordance with the Plan." (Id. at ¶ 8.2(d)-(e).)

status report, dated April 1980, explicitly notes that Briscoe had a Pension Plan.  (Calafati

Decl. ¶11 (noting that the report states "[a] review has been made of payroll taxes, insurance,

union benefits and the company Pension Plan."))

Briscoe claims that Travelers should have realized that the Plan was overfunded

because, after 1982, "money did not have to go into the Plan."  (Hr'g Tr., July 25, 2005 at

25:16.)  Briscoe argues that BCI was created as an affiliate of Briscoe in 1985, with the full

knowledge of Travelers. (Calafati Decl., ¶ 15.)  Mr. Calafati argues that he encouraged

Travelers to audit the BCI financials throughout the ADC Programs.  (Calafati Decl., ¶ 15.)

Briscoe argues that Travelers engaged the firm of Hess Kealy[7] to audit its financials in 1989

and 1991.

Also, Briscoe argues that Travelers knew that the Briscoe Pension Plan was fully

funded or overfunded when the ADC was drafted and did not specifically enumerate the Plan

among the assets that would be considered as collateral.  (Pl.'s. Br. Opp'n Defs.' Mot.

Summ. J. at 4.)

### 4.    Waiver, Estoppel, Laches Defenses

Finally, Briscoe asserts a laches defense, arguing that Travelers waived any

right to object to Briscoe's use of the overfunding by failing to present a more timely objection.

Briscoe argues that Travelers is estopped from making the argument that the assets of

the Plan constitute collateral that is subject to distribution to Travelers under the ADC.  The

doctrine of laches, Briscoe contends, bars the return of any funds allegedly diverted by Briscoe

in its administration of the Pension Plan.  Rather, equity requires that this Court find that

_____

[7] Hess Kealy later became known as Mortensen and Co.  (Calafati Decl. ¶18.)

Travelers' claims are barred by the more than twenty year gap between the period of overfunding (the early 1980's) and Travelers' current motion.

**D.      Identifying the Acts of Diversion**

Briscoe's arguments defending the use of the Briscoe Pension Plan assets as "ordinary and prudent" may be summarized as: 1) an argument that Briscoe had the authority and properly exercised its authority in transferring Briscoe Pension Plan assets to the BCI Pension Plan; and 2) Travelers acquiesced to Briscoe's use of the assets, and its delay in asserting its claim unfairly prejudices Briscoe.

As explained below, this Court finds that the Agency Opinion, in particular, and the law of the case generally require a finding that Briscoe is Travelers' agent and that Briscoe's acts in using the overfunding of the Briscoe Pension Plan to fund the BCI Pension Plan were beyond the scope of Briscoe's authority.  In addition, this Court also finds Briscoe's argument that Travelers' claim is barred by certain asserted affirmative defenses unavailing.

In the Agency Opinion, this Court found that Briscoe "is Travelers' agent."  899 F. Supp. at 1334.  In Judge Wolin's Order and Opinion of May 28, 1996, the Court further found that the Briscoe Pension Plan overfunding is an intangible asset.  Because the Court had previously held that intangible assets are ADC collateral, the Court concluded that the Pension Plan assets are also Collateral.

During the May 28, 1996 hearing, Judge Wolin entered a restraining order and in his ruling stated that "[t]he Court will grant [sic] Traveler's motion to restrain any further diversion of the overfunding and to provide access to all documents and information within Briscoe's possession, custody and control regarding the plan."  (Tr. Hr'g May 28, 1996 at 12:1-12.)

Therefore, Judge Wolin considered the overfunding to be Collateral payable to Travelers, pursuant to the ADC.  In consideration of Judge Wolin's ruling, and as is required pursuant to the law of the case, this Court finds that any effort by Briscoe to use the value of the overfunding was subject to Travelers' approval.

Briscoe acknowledges that if they wanted to use any of the collateral, they had to seek Travelers' consent. (Hr'g Tr., July 25, 2005 at 31 ("we [Briscoe] have to go to them and say how do we intend to apply [the money], and we ask them for it.") Briscoe argues however, that this general rule did not apply to money to be used for the purpose of providing employee benefits. Briscoe argues that the ADC's silence as to how Briscoe should treat employee benefits funds is evidence that the ADC does not govern the use of those same funds.

Briscoe's arguments justifying how it used the overfunding are irrelevant to the sole remaining issue before this Court.  The sole remaining issue regarding the Pension Plan Counterclaim "is the manner in which the overfunding should be repaid to Travelers."  65 F. Supp. 2d at 307.

Moreover, the arguments Briscoe asserts as grounds for revisiting the issues already resolved by this Court do not pass muster under the rigorous standard set forth in the law of the case doctrine.  Briscoe's argument that the amendments were necessary to motivate and retain key employees is unpersuasive, much less persuasive enough to justify departure from the law of the case.  Briscoe argues that, without the motivation of the increased pension and the reduced hour requirement to qualify for pension resources, the BCI employees would have left and the collection of collateral would not have been as successful.

First, Briscoe's argument assumes there was no way to retain the workers except through

these methods; Briscoe offers no evidence supporting this assertion.   Mr. Calafati's bald

assertions and this Court's previous rulings do not create the "extraordinary circumstances" that

warrant a court's reconsideration of an issue decided earlier in the course of litigation.  Public

Interest Research Group of N.J., Inc., 123 F.3d at 116.  Similarly, this Court cannot determine

with any degree of certainty that any or all of the BCI employees who were recipients under the

Plan would have refused or terminated employment based on the continued receipt of the

benefits at issue.[8]

　　　　Central to these issues, however, is this Court's previous finding that Briscoe is

Travelers' agent.  It is in that capacity that Briscoe undertook several distinct acts which led to

amending the Briscoe Pension Plan and diverting the overfunding.  Briscoe directs this Court to

correspondence by Mr. Green, *inter alia*, indicating times that Travelers gave Briscoe permission

and authority to employ a workforce to assist in the Program.  Briscoe's characterization of the

scope of the authority given it is, however, unsupported by the record.  As discussed below, this

Court finds that Travelers did not discover the full extent of the overfunding until well after the

amendments and with the assistance of an Order by this Court.  Briscoe does not persuasively

argue that Travelers gave Briscoe, expressly or impliedly, any authority to use the overfunding.

　　　　Briscoe's arguments regarding Travelers' delay in asserting the Pension Plan

Counterclaim are similarly unpersuasive, given the law of the case doctrine.  Briscoe argues that

Travelers' claims regarding the overfunding are barred by the affirmative defenses of laches,

waiver, and estoppel.  Travelers asserts that it learned of the diversion of the Plan assets in 1995

---

[8] Briscoe does argue that many of the BCI employees were former employees of Briscoe and,
after their employment with Briscoe terminated, they began to collect Social Security
benefits that were threatened by their decision to accept positions at BCI.

through discovery. (Defs.' Reply Br. Supp. Mot. Part. Summ. J. and Opp'n to Pl.'s Request for Judicial Notice, at 2.)

The doctrine of laches is an affirmative defense which addresses inexcusable delay on the part of the party bringing a claim, to the prejudice of the party asserting the defense. Degussa v. Construction Chemical Operation, 280 F. Supp.2d. 393, 411 (E.D. Pa. 2003).  As the party asserting laches as an affirmative defense, Briscoe must establish (1) an inexcusable delay in bringing the action and (2) prejudice.  Id.  To state a claim alleging equitable estoppel, one element that must be proven is that the party estopped must have knowledge of the material facts, or "at least the circumstances must be such that knowledge of them is necessarily imputed to him."  Global American Insurance Managers v. Perera Co., Inc., 137 N.J. Super. 377, 393 (N.J. Super. Ct. Ch. Div. 1975).

While Briscoe argues that reports were presented to Travelers clearly stating the amount of assets in the Plan when the Plan was underfunded,[9] Briscoe acknowledges that it did not expressly notify Travelers of the overfunding, nor did it identify the overfunding as an asset collectible by Travelers as Collateral.  (Hr'g Tr., July 25, 2005 at 32.)  Briscoe argues, however, that Travelers should have known that there were excess funds in the benefits plan because they received periodic reporting on the plan and because "they knew the plan had not been terminated."  (Hr'g Tr., July 25, 2005 at 33.)  Briscoe posits that Travelers should have discerned

_____

[9]  Briscoe argues that CMA "constantly monitored the status of the Plan" and cites CMA reports in reviewing Briscoe's contributions to the plan in late 1979 and 1980.  (Calafati Decl. ¶ 12.)  Briscoe cites its financial statements from 1977 and 1978, noting that these financial statements "reflected the existence of the plan and the amount of liability associated with them."  (Calafati Decl. ¶ 13, Ex. C, Frank Briscoe Company, Inc. Financial Statements December 31, 1978 and 1977.)  Briscoe argues that these financial statements were shared with CMA and Travelers' counsel, Mark Larner, Esq. (Calafati Decl. ¶ 13.)

that the "assets equaled or exceed the liabilities at all times from 1983 forward."  (Hr'g Tr., July 25, 2005 at 33.)

Briscoe's arguments do not persuade. Despite the overwhelming evidence to the contrary presented to Judge Wolin in anticipation of the May 28, 1996 hearing, Briscoe seeks to argue that Travelers was aware of the overfunding or should have been aware of the overfunding and delayed in asserting its rights to the Pension Plan assets.  In the Summary Judgment opinion, this Court expressly noted that Travelers was seeking information regarding the Briscoe Pension Plan, and Judge Wolin ordered Briscoe not to continue to refuse to permit Travelers to have access to the documents relating to the Pension Plan.[10]  It is disingenuous for Briscoe to now claim that Travelers is responsible for the delay,  and that it was not diligent in seeking out information regarding the overfunding.

This Court reaffirms its previous determinations that the overfunding, or excess in assets in the Briscoe Pension Plan, constitutes Collateral that belonged to Travelers, pursuant to the ADC.  This Court has found that Briscoe is Travelers' agent.  As Briscoe concedes, it did not have authorization from Travelers to direct the collateral to the BCI Pension Plan.  This Court finds that Briscoe exceeded its authority as Travelers' agent when it transferred the excess in assets from the Briscoe Pension Plan to the BCI Pension Plan. The diverted funds are Collateral and subject to collection by Travelers.

## II.    Cross-Motion to Strike Samet Report

Travelers has submitted the expert report of Michael Samet.  Mr. Samet is a partner at

---

[10] The Summary Judgment Opinion notes that "at a court hearing on May 28, 1996, Judge Wolin found that . . . Briscoe could not refuse to allow Travelers to inspect its documents concerning the Pension Plan." 65 F. Supp.2d at 292 (footnote omitted).

Ernst & Young LLP and has over 24 years of experience in the pension actuarial field.  Mr. Samet has been at Ernst & Young for 13 years, and a partner for 7 years.  Mr. Samet specializes "in the design, funding, and administration of qualified and nonqualified defined benefit and defined contribution plans."  (Aff. Susan Schwartz, Ex. A, Samet report, 2.)  Mr. Samet's report identifies six methods that Briscoe adopted that constitute diversion of the overfunding.

The first method of diversion identified in the Samet Report relates to Briscoe's amendment of the Plan effective January 1, 1989.  According to Samet's Report, the total amount attributable to the diversion under this method is $308,849, as of June 21, 2004.

The second method of diversion, according to Samet's Report, reduced the compensation level requirement for qualifying for the Pension Plan. The Samet Report states that the total amount attributable to this method of diversion is $13, 288, as of June 21, 2004.

The third method of diversion reduced the number of hours-worked required to qualify for the Plan. According to Mr. Samet, the total amount attributable to this diversion category is $31,074, as of June 21, 2004.

The fourth method of diversion relates to a series of amendments, rendering the Plan effective January 1, 1987, and January 1, 1993, increasing benefits to all participants by 76% and 19%,  respectively, and an amendment rendering the Plan effective January 1, 1989, which eliminated all integration with Social Security.  According to the Samet report, the total amount attributable to this diversion is $3,014,456, as of June 21, 2004.

The fifth method of diversion involves Briscoe's inappropriate inclusion of bonus, overtime and other remuneration for personal services rendered to the employer used to calculate participants' eligibility for benefits.  According to the Samet report, the total amount attributable

to this diversion is $24,451, as of June 21, 2004.

The sixth method of diversion relates to pension distributions made prior to certain participants' termination of employment based on a Plan amendment allowing in service distributions beginning at age 65.   According to the Samet report, the total amount attributable to this diversion is $235,797, as of June 21, 2004.

According to Briscoe, Samet's report is inadmissible because: 1) it is unverified; 2) it is based on an erroneous interpretation of the law of the case; and 3) it fails to account for the financial boon that Briscoe's acts created for Travelers. None of these arguments persuades this Court to grant the motion to strike.

Briscoe's first argument against admission of Mr. Samet's affidavit has been resolved by submission of a verified affidavit.[11]

As to the second argument, according to Briscoe, "Samet's assumption . . .is that the prior rulings of this Court establish as a matter of law that any use of the plan assets, other than to provide benefits on the exact basis they existed in 1982, is an unlawful 'diversion.'" (Mem. Law in Supp. Pl.'s Cross-Motion to Strike Report of Michael Samet, hereinafter, "Pl.'s Cross-Motion to Strike," at 2).  As this Court has indicated above, the law of the case requires a finding that any use of Plan assets apart from satisfaction of the Plan's liabilities constitutes diversion.

As to the third argument, Briscoe contends that Mr. Samet's report is flawed in that it fails to acknowledge the growth of the assets in the plan.  Yet, even if true, such a flaw goes to the weight to be accorded to any of the report's conclusions; it does not provide a ground for

---

[11] Mr. Samet's report was submitted to the Court as an attachment to the affidavit of Susan J. Schwartz.  Traveler's supplemented the record with Samet's sworn affidavit. See Samet Affidavit.

striking the report in its entirety.  Briscoe's disagreements with the report's conclusions may

gain traction when the finder of fact weighs the evidence quantifying the diversion.  The motion

to strike will be denied.

Furthermore, while this Court need not assess the merits of the Samet Report at this

juncture, Briscoe fails to persuade this Court that it should overlook the diversions because

Travelers benefitted from Briscoe's management of its money.  According to Briscoe, Travelers

has not suffered any harm, but rather benefitted from the delay in terminating the Plan.  The total

plan assets were $3,966,976 in September of 1987, Briscoe argues, and the present value of

benefits was $2,793,550.  (Pl.'s Cross-Motion to Strike," at 4; Moloshok Decl., Mercer Letter,

Ex. D.)  Briscoe claims that the amount available for reversion before excise taxes or early

termination adjustments to the Guaranteed Income Plan and other costs was at most $1,173,417.

(Pl.'s Cross-Motion to Strike, at 5.)  Briscoe contends that if the plan had been terminated in

1987, there would have been a 50% excise tax, resulting in a revertible amount of $586,709.

(Pl.'s Cross-Motion to Strike, at 5; Moloshok Decl., Mercer Letter, Ex. D.)[12]

Briscoe argues that Travelers has suffered no loss because the assets have grown in the

Plan.  Instead, Briscoe argues, Travelers enjoyed the tax-free growth that occurred as a result of

Briscoe not terminating the Plan. (Pl.'s Cross-Motion to Strike, at 5.)  Travelers argues that none

of Briscoe's acts that constitute the alleged diversions were authorized by Travelers, and that all

of the acts were self-serving and in violation of Briscoe's obligations as an agent. Travelers

---

[12]  Briscoe also notes that the "benefits could have increased 20% and the excise tax would then
drop to 20%" which would have resulted in a revertible amount $704,050. (Pl.'s Cross-Motion to
Strike," at 5; Moloshok Decl., Mercer Letter, Ex. D.)] In any case, Briscoe argues, that the
amount of assets at the termination of the Plan would have been subject to income taxes or the
"burn-out" of Briscoe's net operating loss portions carryforward. (Pl.'s Cross-Motion to Strike,
at 5; Moloshok Decl., Mercer Letter, Ex. D.)

further argues that it did not learn of the overfunding until 1996. According to Travelers, Briscoe intentionally and maliciously made it difficult to obtain information regarding the overfunding, ultimately requiring the 1996 oral argument before Judge Wolin, an opinion and order by Magistrate Judge Pisano, and an opinion and order by this Court, for Travelers to obtain sufficient information to commission the expert report and assess a valuation of the overfunding.

Briscoe's arguments here are disingenuous. If the acts Briscoe undertook constitute diversion, or misappropriation of property that could be deemed collateral owed to Travelers under the ADC, then this Court may not, and will not, overlook Briscoe's acts on the grounds that the diversion might have ultimately resulted in a benefit. Clearly, there are no grounds here for denying Travelers' motion for summary judgment.

Moreover, Briscoe errs in arguing that, absent the amendments and other actions taken by Briscoe, the value of the Pension Plan assets would not have increased.[14] Briscoe's argument overlooks the harm that motivates Travelers' complaint. The increase or decrease in the value of the assets is not at issue. Moreover, the increase in value of the pension assets could largely, and arguably solely, be attributed to the investment advisors of the Plan. While it may be true that, had the Plan had been liquidated immediately upon overfunding, Travelers might have incurred certain tax liabilities and would not have had the benefit of the value of the assets having rested safely in investments for the near two decades that they remained in Briscoe's possession, this point is irrelevant. The delay in Travelers' possession interfered with Travelers' right to use the money as it saw fit. This harm is not abated by the

---

[14]   Mr. Moloshok: "If we, quote-unquote, use this up, it wouldn't have gone from the $750,000 anticipated reversion in 1986 to a $3.4 million anticipated reversion in 2004. . . . They have absolutely no damage."  (Hr'g Tr., July 25, 2005, at 10.)

fact that the value of the money held by Briscoe increased over time.

Briscoe also argues that without the motivation of the increased pension and the reduced hour requirement to qualify for pension resources, the BCI employees would have left and the collection of collateral would not have been as successful. Briscoe argues that the ADC program would not have succeeded because FBC would have lost its employees and the small remainder would not have been motivated and FBC would have been unable to complete the construction jobs and collect receivables. This argument is without merit.

First, the argument assumes there was no way to retain the workers except through the diversions. There is no evidence of this. Second, it is mere speculation to assert that any or all of the BCI employees who were recipients under the plan would have refused or terminated employment had pension benefits not changed. Third, Briscoe's argument assumes that Travelers preferred that Briscoe take these actions rather than accept the termination of the BCI workers. Here, Briscoe disregarded Travelers' right to choose how to manage the overfunding; the decision to grant the benefit of the overfunding to the BCI employees should properly have been left to Travelers. Moreover, the fact that Mr. Calafati, his sons, and brother were among the largest beneficiaries of this decision creates the unflattering impression that Briscoe intentionally shuffled the resources and amended the Plan to dilute the value of Travelers' collateral.

## III.   Defenses to Remaining Counterclaims

Travelers has separately moved for partial summary judgment on Briscoe's defenses to the remaining counterclaims in Travelers' Third Amended Answer and Counterclaim with Jury Trial Demand. (Defs.' Memo. Law in Supp. Their Mot. for Partial Summ. J. on Pl.'s

Defenses to Defs.' Remaining Countercls. at 1-2.)   The moving party's burden of proof at summary judgment rests on which party has the burden of proof at trial.  "When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986); accord Elkins v. Richardson-Merrell, Inc., 8 F.3d 1068, 1071 (6th Cir. 1993).  Thus, to prevail on this motion, Travelers must show that Briscoe cannot sustain its burden of proving the affirmative defenses at trial.  It has done so.

The specific counterclaims at issue are the Pension Counterclaims, filed by Travelers on June 6, 1996.  On September 13, 1999, this Court issued the Summary Judgment Opinion, which stated: "The Court has already determined that the pension fund was overfunded.  The only remaining issue is the manner in which the overfunding should be repaid to Travelers." Briscoe, 65 F.Supp.2d at 307.  Briscoe subsequently sought to amend its Complaint to add the defenses at issue and, on December 1, 2000, this Court granted leave to do so.

Travelers seeks summary judgment on the following of Briscoe's defenses: Travelers' Pension Counterclaim fails to state any claim for relief (First Defense); Travelers suffered no damages from the acts alleged in the Pension Counterclaim (Second Defense); Travelers' Pension Counterclaim is barred by waiver, estoppel, laches, and unclean hands (Third Defense); Travelers' Pension Counterclaim is barred because the Court has found that Briscoe is not in default (Fourth Defense); the Reservation Rights Agreement entered into in relation to the June 23, 1994 Las Vegas Settlement Agreement bars Travelers' Counterclaim (Fifth Defense); Travelers' Pension Counterclaim is barred because Travelers breached the ADC (Sixth Defense); Travelers' Pension Counterclaim is asserted in bad faith (Seventh

Defense); Travelers' Pension Counterclaim is barred because Travelers' actions have been

commercially unreasonable (Eighth Defense); Travelers' Pension Counterclaim is barred

because Travelers' actions have been unconscionable (Ninth Defense).

In its opposition to Travelers' motion for summary judgment, Briscoe did not contest

the entry of summary judgment on the fourth, fifth, seventh, eight, and ninth defenses.  (Pl.'s

Opp'n Br.)  During oral argument, Briscoe moved to amend its response to include the

seventh defense among those that remain contested.[16]  This Court granted Briscoe's motion.

(Hr'g Tr., July 25, 2005 at 49.)   Thus, at issue before this Court on Travelers' instant motion

for summary judgment are Briscoe's first, second, third, sixth, and seventh defenses to

Travelers' counterclaims, alleging failure to state a claim, lack of damages, waiver, estoppel,

laches and unclean hands, breach of the ADC, and bad faith, respectively.

Travelers argues persuasively that, under the doctrine of the law of the case, the

Summary Judgment Opinion bars these defenses.  In the Summary Judgment Opinion, this

Court determined that, as to the Pension Counterclaims, there was only one remaining issue:

how the overfunding should be repaid.  Briscoe, 65 F.Supp.2d at 307.  This determination

leaves no room for Briscoe to assert defenses to the Pension Counterclaims, since success on

any defense would require reversal of this Court's judgment that the Pension Counterclaims

were viable.  Moreover, as Travelers has contended, allowing Briscoe to succeed on defenses

to the Pension Counterclaims would require relitigation of settled issues.   Because the law of

the case precludes Briscoe from succeeding on these defenses, this Court grants summary

judgment in favor of Travelers on each of Briscoe's first through ninth affirmative defenses.

---

[16] Briscoe amended its response to Travelers' motion during oral argument to include the
seventh defense. (Hr'g Tr., July 25, 2005 at 49:20.)

**IV.    Request for Judicial Notice**

Briscoe's request for judicial notice is proffered as an alternative means for calculating damages for the diversion of Pension Plan assets. Briscoe argues that the information regarding the inflation rate "bears on whether the changes that were made were in any sense extraordinary." (Hr'g Tr., July 25, 2005 at 18:2-4.)  Briscoe argues that the issue of inflation bears on whether the decisions that Mr. Samet discusses were reasonable decisions.  (Hr'g Tr., July 25, 2005 at 18.)

This Court denies Briscoe's request that the Court take judicial notice of the inflation statistics compiled by the Department of labor.  Briscoe seeks to admit general information that is common knowledge without any explanation as to how the statistics of the Department of Labor would allow this Court to perform the "sole remaining" task of quantifying the amount of the overfunding.  To the extent that Briscoe's argument that the statistics should be admissible as to demonstrate that the acts it engaged in transferring assets from the Briscoe Pension Plan to the BCI Pension Plan did not constitute diversion, this Court's findings extinguish the need to admit the statistics on this ground.  Fed. R. Ev. 104(b).  This Court need not take judicial notice of what the inflation rate was at any given time to determine whether the decisions Briscoe made were within the scope of its authority: this Court has found that the decisions were outside the scope of Briscoe's authority and Briscoe's acts amending the Plan constitute diversion.

## CONCLUSION

Having reviewed parties' submissions, the law of the case, relevant provisions of the ADC, and applicable precedent, this Court denies Plaintiff's request for the Court to defer

consideration of the motions currently before the Court until the resolution of certain of

Briscoe's in limine motions; denies Plaintiff's request that the Court take judicial notice of

changes in the inflation rate, pursuant to the Consumer Price Index calculated by the United

States Department of Labor, Bureau of Labor Statistics; denies Plaintiff's cross-motion to

strike the expert report of Defendants' expert, Michael J. Samet; grants Defendants' motion

for summary judgment on the remaining issue of the Pension Plan Counterclaim; and grants

Defendants' motion for partial summary judgment on Plaintiff's defenses to Defendant's

remaining counterclaims.


                                                   __S/Joseph A. Greenaway, Jr._____
                                                 JOSEPH A. GREENAWAY, JR., U.S.D.J.


Dated: March 13th, 2006